**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CASE NO.: 25-cr-72-APM** |
| **v.** | * | |
| **JOSEPH MICHAEL THOMPSON** | * | |
| **Defendant** | * | |
| _____/ | | |

## DEFENDANT'S SUPPLEMENTAL MEMORANDUM TO MOTION TO SUPPRESS

Defendant Joseph Thompson, through counsel, Wole O. Falodun, respectfully submits this memorandum in further support of his Motion to Suppress, filed with this Court on or about June 25, 2025. Mr. Thompson seeks suppression of all evidence derived from the warrantless stop, seizure, and search of his person by members of the Metropolitan Police Department on March 7, 2025.

This case arises from an encounter between police and Mr. Thompson as he exited South Capitol Liquor Store, located at 4654 Livingston Road, S.E., Washington, D.C. During that encounter, officers came to believe that Mr. Thompson was carrying a firearm. However, they did not have probable cause to arrest him, nor did they have reasonable articulable suspicion that he was engaged in criminal activity.

Nevertheless, officers forcibly seized Mr. Thompson by grabbing him and taking him to the ground. During that seizure, a firearm became dislodged from Mr. Thompson's person and fell into the roadway. Officers then proceeded to search Mr. Thompson and recovered a ¾-full vial containing suspected phencyclidine.

Following the search, officers questioned Mr. Thompson and obtained statements from him without first advising him of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966).

The seizure and search of Mr. Thompson violated the Fourth Amendment because law enforcement lacked both probable cause and reasonable articulable suspicion to stop or seize him.  Officers also violated Mr. Thompson's Fifth Amendment rights by subjecting him to a custodial interrogation without first advising him of the warnings required by law.  For those reasons, Mr. Thompson respectfully moves to suppress all evidence arising from the events of March 7, 2025, including any statements allegedly made by him.

## I.     BACKGROUND

On March 7, 2025, members of the Metropolitan Police Department's Robbery Suppression Unit approached Mr. Thompson as he exited South Capitol Liquor Store, located at 4654 Livingston Road, S.E., Washington, D.C.  The officers were not responding to any specific call for service at that location.  Instead, they were there based on general concerns about crime in the area over the preceding six months, as testified to by Lieutenant Vicki Steen at a suppression hearing, in this case, held on March 5, 2026.  Much of the encounter was captured on body-worn camera footage.  *See* Def. Exhibits 2 and 3.[1]

According to law enforcement, officers considered the following conduct by Mr. Thompson to be suspicious:

i.   Mr. Thompson was standing in front of South Capitol Liquor Store;

ii.  As officers entered the block, Mr. Thompson entered the liquor store;

iii. Officer Guzman followed him inside, where Mr. Thompson was observed making a purchase from the store clerk;

iv.  Mr. Thompson then exited the store carrying a black bag, and Officer Guzman immediately followed him back outside; and

---

[1] Defendant's Exhibits 2 and 3 are the body-worn camera footage from Lieutenant Vicki Steen and Officer Davon Todd respectively, and both were admitted into evidence at the suppression hearing.

v.  According to police, although the bag did not appear to be substantially heavy, Mr.

Thompson kept his right arm pressed against his body while attempting to keep his

unzipped black coat from blowing open.

As Mr. Thompson walked away from the storefront, Officer Guzman followed him and

called out, "Sir! Hey sir!"  Mr. Thompson looked back and responded, "Huh?"  Officer Guzman

then said, "How's it going, man?  Everything good with you?"  Mr. Thompson replied, "I'm

good," and kept walking.  Officer Guzman continued after him, saying, "How have you been?

Hey, your right side man looks kind of heavy.  Come here."  By then, Officer Todd had also

started following Mr. Thompson.  *See* Gerstein Affidavit – Attachment A.  (The screenshot below

shows both officers following Mr. Thompson as he walked away from the liquor store.)



Mr. Thompson turned and appeared confused by Officer Guzman's comment about his

right side.  At that point, with two officers following behind him, Mr. Thompson ran from the

officers as they tried to ambush him after he left the store.  The officers chased him a short

distance before Officer Todd grabbed Mr. Thompson's jacket in an effort to stop him.



Mr. Thompson was seized almost immediately, only a few feet from where the chase began.  At that point, officers grabbed him by the arm, forcefully spun him around, and slammed him onto the pavement before placing him in handcuffs.

The officers used so much force in seizing Mr. Thompson that, as they took him to the ground, personal property came off his person and onto the ground.  That property included paper currency and the firearm charged in this case.

After arresting Mr. Thompson, officers searched him and discovered a ¾-full ounce vial containing suspected phencyclidine.

While handcuffed, under arrest, and surrounded by police, Mr. Thompson was questioned by officers without first being advised of his rights under *Miranda*, 384 U.S. 436 (1966).

As noted above, the events surrounding the warrantless seizure and search of Mr. Thompson were captured on police body-worn camera footage.  The Government claims that officers observed Mr. Thompson "tossing a firearm from his right hand towards the street." However, body-worn camera footage produced in discovery and played during the March 5, 2026, suppression hearing does not show Mr. Thompson throwing a firearm.  Instead, it shows Officer Davon Todd grabbing Mr. Thompson's jacket, then his right arm, and violently swinging

him to the ground, causing personal effects to come off his person.  (The screenshots below were taken from footage captured by Lt. Steen's body-worn camera, and they are sequential in time. The first one depicts Officer Todd grabbing Mr. Thompson's jacket before the firearm came loose.  Mr. Thompson can be seen holding a black plastic bag in his left hand.  The second depicts the firearm, circled in purple, becoming visible for the first time after Officer Todd already grabbed Mr. Thompson's jacket.)



5



## II.     ARGUMENT

### I.     The Fourth Amendment Requires Suppression Because Mr. Thompson Was Seized Without Reasonable Articulable Suspicion

The Fourth Amendment prohibits unreasonable searches and seizures and requires that

police possess, at minimum, reasonable articulable suspicion before detaining an individual for

investigative purposes.  U.S. Const. amend. IV.  Officers may conduct a brief investigatory stop

only when they can point to "specific and articulable facts" suggesting that criminal activity is

afoot.  *Terry v. Ohio,* 392 U.S. 1 (1968).  The reasonable suspicion inquiry focuses on the

moment the seizure occurs and must be justified by objective facts known to officers at that precise time. *Id.*

Under Supreme Court precedent, a person is seized when an officer applies physical force with the intent to restrain that person's movement. In *Torres v. Madrid,* 592 U.S. 306 (2021), the Court made clear that "the application of physical force to the body of a person with intent to restrain is a seizure," even if the person does not immediately submit or succeeds in escaping the officer's grasp. The moment of physical contact therefore marks the constitutional point at which the legality of the stop must be evaluated.

In the instant case, the body-worn camera footage shows that Officer Todd seized Mr. Thompson when he reached out and grabbed the back of Mr. Thompson's jacket while Mr. Thompson was running. That act constituted the application of physical force intended to restrain Mr. Thompson's movement and therefore qualifies as a seizure under *Torres.*[2]

The Government cannot rely on events occurring after that moment to retroactively justify the stop. The Fourth Amendment requires that the seizure be justified "at its inception." *Terry,* 392 U.S. 1 (1968).

At the moment Officer Todd touched Mr. Thompson's jacket, the officers did not possess reasonable articulable suspicion that Mr. Thompson was engaged in criminal activity. Based on testimony provided by Officer Vicki Steen and Officer Todd at the suppression hearing, it is abundantly clear that officers had not observed any illegal conduct, had not received any report of criminal activity, and had not seen a firearm or contraband. Their suspicion rested solely on three factors: (1) a perceived "heavy" object in Mr. Thompson's pocket, (2) his subsequent flight, and (3) the alleged character of the neighborhood as a high-crime area.

---

[2] At the March 5, 2026, suppression hearing, Officer Todd testified that police made contact with Mr. Thompson, chased after him, and grabbed him because they intended to restrain his movement.

None of those factors, whether viewed individually or together, satisfies the constitutional standard required by *Terry.*

## II.    A "Heavy Pocket," Flight, and Generalized Location Evidence Do Not Establish Reasonable Suspicion

The officers' observation of a "heavy rectangular object" in Mr. Thompson's jacket pocket does not provide the type of specific, articulable fact required by *Terry.*  Courts have repeatedly emphasized that reasonable suspicion cannot rest on "inchoate and unparticularized suspicion or 'hunch.'"  *Id.*

At the suppression hearing, Officers Steen and Todd testified that they did not observe the outline of a firearm, a visible grip, or any other distinctive characteristic indicating the presence of a weapon.  At most, they claim they observed bulk or weight in the pocket of a puffy winter jacket.  An observation equally consistent with numerous innocent explanations. [3]

Nor did Mr. Thompson's flight convert that ambiguous observation into reasonable suspicion.  Although the Supreme Court recognized in *Illinois v. Wardlow,* 528 U.S. 119 (2000), that unprovoked flight may be a relevant factor in a reasonable suspicion analysis, the Court expressly rejected any categorical rule that flight automatically establishes reasonable suspicion.

Just as important, the context of the flight matters.  Here, Mr. Thompson did not flee merely upon seeing police.[4]  Rather, he ran only after officers singled him out and commented that his pocket "looked heavy," which amounted to an implicit accusation that he was carrying a weapon. This fact distinguishes the instant case from *Wardlow.*  Flight under the circumstances in the instant case did not necessarily suggest consciousness of guilt.

---

[3] At the suppression hearing, Officer Steen, Officer Todd, or both, claimed that they observed a rectangular object in Mr. Thompson's pocket, which they admitted could have been a phone, wallet, or battery-pack.

[4] The body-worn camera footage in this case shows that Mr. Thompson did not flee merely upon seeing police, a point Officers Steen and Todd both acknowledged during their testimony at the suppression hearing.

The Government's reliance on Officer Steen's testimony at the suppression hearing that the area was a "high-crime" area likewise fails.  The Supreme Court has made clear that an individual's presence in an area associated with crime, "standing alone, is not enough to support a reasonable, particularized suspicion." *Wardlow,* 528 U.S. 119 (2000).  Allowing generalized location evidence to justify a seizure would impermissibly subject entire neighborhoods to diminished Fourth Amendment protections.  At the suppression hearing, Lt. Steen when questioned on cross-examination, was unable to offer crime statistics for other police service areas (PSAs), or any baseline for comparison, that would distinguish PSA 708 as a high-crime area.[5]

Taken together, the Government's proffered factors amount to nothing more than generalized suspicion unsupported by objective facts linking Mr. Thompson to criminal activity.

### III.    The Government's Abandonment Theory Is Contradicted by the Body-Worn Camera Evidence

The Government alternatively argues that Mr. Thompson abandoned the firearm before any seizure occurred and that officers therefore recovered the weapon lawfully.  That contention is directly contradicted by the body-worn camera footage.

As shown above, Officer Todd grabbed the back of Mr. Thompson's jacket before any firearm is visible or identifiable.  It is only after that contact that a metallic object can be heard skidding across the asphalt on the video(s).  Only after that contact, and the resulting struggle, does the firearm appear in the video record.

Because officers applied physical force to restrain Mr. Thompson before any firearm became visible, the seizure had already occurred under *Torres*. That conclusion is reinforced by Officer Todd's testimony at the suppression hearing.  Officer Todd testified that he was the

---

[5] Mr. Thompson was arrested in PSA 708.

officer closest to Mr. Thompson during the chase, that he never saw Mr. Thompson toss a firearm, and that although he was the first officer to make contact with Mr. Thompson, he did not see a firearm before making contact. Officer Steen, by contrast, testified that she saw Mr. Thompson toss the firearm even though she was farther away from him than Officer Todd. The videos in evidence and the screenshots above plainly contradict that claim. The Government therefore cannot avoid the constitutional consequences of the seizure by later characterizing the firearm as "abandoned."

Where property is discarded only after an unlawful seizure, the evidence is considered the fruit of that unconstitutional conduct. The Supreme Court has long held that evidence obtained through exploitation of an illegal seizure must be suppressed under the exclusionary rule. *Wong Sun v. United States,* 371 U.S. 471 (1963).

In the instant case, the causal chain is direct. The officers' unlawful seizure, established when Officer Todd grabbed Mr. Thompson's jacket, immediately preceded the appearance of the firearm. Because the discovery of the weapon flowed directly from that unconstitutional seizure, the firearm and all derivative evidence must be suppressed.

IV.    **The Firearm and All Derivative Evidence Must Be Suppressed as Fruits of the Unlawful Seizure**

Under the exclusionary rule, both primary evidence obtained as a result of an unconstitutional search or seizure and any evidence derived from that illegality must be suppressed. *Wong Sun,* 371 U.S. 471 (1963).

Because the firearm became visible only after Officer Todd unlawfully seized Mr. Thompson, the firearm, along with the narcotics recovered during the subsequent search incident-to-arrest, are fruits of that illegality. The Government cannot establish that the evidence

was obtained through an independent source or that the connection between the unlawful seizure and the discovery of the evidence was sufficiently attenuated to purge the constitutional taint.

Accordingly, the firearm and all derivative evidence must be suppressed.

## CONCLUSION

For the foregoing reasons, Mr. Thompson respectfully requests that this Court grant his motion to suppress the firearm and all evidence derived from the unlawful seizure.

Respectfully submitted,

**Falodun Law, LC**

/s/ Wole O. Falodun

Wole O. Falodun (#976572)
8850 Stanford Blvd., Ste 2900
Columbia, MD 21045
Tel: (301) 289-7737
Fax: (301) 337-7822
Email: wole@falodunlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March 2026, I caused the foregoing Defendant's Supplemental Memorandum to Motion to Suppress and the proposed order to be filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record via the CM/ECF system.

/s/ Wole O. Falodun

Wole O. Falodun